**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Alex BEVERLY, Betty McNulty, George Brown and Diane Griffin,
Defendants–Appellants.**

Nos. 88–2985 to 88–2988.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 27, 1989.

Decided Sept. 7, 1990.

Thomas M. Durkin, Julia E. Getzels, Asst. U.S. Attys., Chicago, Ill., for U.S.

Thomas J. Fleischmann, Terence E. Flynn, Gessler, Flynn, Fleischmann, Hughes & Socol, Chicago, Ill., for Alex Beverly.

Benjamin E. Starks, Starks & Associates, Chicago, Ill., for Betty McNulty.

Herbert L. Goldberg, Giovannini & Goldberg, Chicago, Ill., for George Brown.

Michael G. Logan, Chicago, Ill., for Diane Griffin.

Before EASTERBROOK and RIPPLE, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

RIPPLE, Circuit Judge.

A jury found the defendants—Alex Beverly, Betty McNulty, George Brown, and Diane Griffin—guilty of various drug trafficking and/or conspiracy offenses. The defendants appeal their convictions on a

multitude of grounds. For the following reasons, we affirm.

## I

## BACKGROUND

On February 10, 1988, a federal grand jury returned a twenty-three count superseding indictment against the defendants.[1] The indictment alleged two conspiracies: count one charged Alex Beverly, George Brown, and Betty McNulty with conspiring to distribute and possess with the intent to distribute heroin and cocaine in violation of 21 U.S.C. § 841(a)(1). Count twenty alleged that Alex Beverly, Betty McNulty, and Diane Griffin conspired to defraud the United States by impairing the efforts of the Internal Revenue Service (IRS) and of the Drug Enforcement Agency (DEA) in ascertaining income taxes and forfeitable assets, respectively, in violation of 18 U.S.C. § 371. In addition to the conspiracies, the indictment charged Alex Beverly, Betty McNulty, and George Brown with multiple narcotics-related offenses. Mr. Beverly also was charged with engaging in a continuing criminal enterprise in violation of 21 U.S.C. § 848. Diane Griffin was charged with only the fraud conspiracy.

### A. Facts

#### 1. Narcotics transactions

#### a. Alex Beverly, George Brown

From at least 1980 to 1986, Alex Beverly controlled a large-scale narcotics operation involving George Brown, Betty McNulty, and others. Mr. Beverly purchased drugs through Peter Suarez, a cocaine supplier and government witness.[2] The two men first met in late 1979. Mr. Beverly was attempting to open an after-hours club in a house on Sangamon Street in Chicago and told Suarez that he needed some cocaine to start the business. Approximately one month later, Suarez met Mr. Beverly at the house on Sangamon. The house was equipped with gambling tables and a bar from which drinks and cocaine were being sold. Suarez met Willie Jordan, who was introduced as Mr. Beverly's "righthand man," and George Brown, who was introduced as Mr. Beverly's "close associate, brother like." Tr. at 729, 730. On this occasion, Suarez sold Mr. Beverly roughly two ounces of cocaine. Over the next few months, Suarez returned to the Sangamon address several times to deliver another two to three ounces of cocaine. Both Mr. Beverly and Mr. Brown were present for each transaction, as was Jordan.

In March 1980, the police raided the Sangamon house and arrested everyone present for gambling, including Suarez, who was there to deliver cocaine. He stopped making deliveries after the raid, but resumed when Mr. Beverly contacted him the next month. In late April of 1980, Suarez went to an apartment on Chicago Avenue and delivered four ounces of cocaine; Mr. Beverly diluted the drug and converted it into rock cocaine. He then gave the cocaine to George Brown and instructed him to take it to a Mayfield Avenue address. Mr. Beverly told Suarez that he had opened a house on Mayfield and was "going to start doing a lot of business out of that house and that he was going to increase the buys of cocaine and the sales." Tr. at 741–42.

Suarez delivered cocaine to Mr. Beverly at the Chicago Avenue apartment several more times, then began making regular deliveries to Mr. Beverly at the house on

---

1. The original indictment was returned against Alex Beverly, George Brown, Betty McNulty, Willie Jordan, Joseph McCorkle, and Charles Avant. The superseding indictment was returned against Alex Beverly, George Brown, Betty McNulty, Diane Griffin, McCorkle, and Avant. Jordan died before the case was tried, McCorkle was found not guilty on all counts, and Avant pled guilty.

2. Suarez testified at trial pursuant to a plea agreement stemming from drug charges in a separate case. Because he had been convicted previously on similar charges, he was a second offender facing up to forty years in prison. Under the plea agreement, he cooperated with the government in exchange for being treated as a first time offender. Suarez was granted immunity for his testimony in this case and ultimately was sentenced to eight years in prison in the separate case.

Mayfield.[3] From 1980 until 1982, Suarez delivered as much as half a kilogram of cocaine to Mr. Beverly as often as once a week. While he was there making deliveries or waiting to be paid, Suarez observed Mr. Brown selling small packages of white powder for $50 and $100. He also observed Mr. Brown convert cocaine from powder to rock form for customers, who then would smoke the drug.

Toward the end of 1981, Suarez became interested in establishing drug connections in Colombia. He continued to supply Mr. Beverly with cocaine, but introduced Mr. Beverly to a friend from Florida who would service Mr. Beverly's drug needs in the interim. Suarez participated in two of these referral drug transactions, one in Florida and one at the Mayfield house in Chicago, in which Mr. Beverly purchased cocaine from Suarez' friend. In July of 1982, Suarez was arrested in Puerto Rico as he tried to bring Colombian cocaine into the United States. He was convicted and imprisoned until December 4, 1985. Shortly after his release, he contacted Mr. Beverly. They met in Chicago in late March of 1986 at a bar called Mercedes.[4] Further cocaine transactions were discussed but no deals were arranged because Mr. Beverly did not have cash available and Suarez could not sell on credit.

In April 1986, Mr. Beverly contacted Suarez and asked to purchase two kilograms of cocaine. Suarez, who was living in Florida, arrived in Chicago on the weekend of April 11, 1986. On April 13, Mr. Beverly, who did not have enough money for both kilograms, purchased half a kilogram of cocaine for $12,000. The men met at Tit's Bar, a business Mr. Beverly had purchased for his girlfriend, Diane Griffin, then went next door to Blacon's Liquor Store, a business owned by Mr. Beverly. George Brown arrived at Blacon's with $10,000 in cash; Mr. Beverly took $2,000 out of the cash register at Tit's to make up the difference. Upon Mr. Beverly's direction to take

the drugs back to the Mayfield house, Mr. Brown left the liquor store with the cocaine. Mr. Beverly then told Suarez that he would be in touch in the future whenever he needed more cocaine. They agreed that the next deal would take place somewhere between Florida and Chicago so that Suarez, who was on parole, would not have to be away from the Miami area for any great length of time.

Toward the end of April 1986, Mr. Beverly again contacted Suarez and indicated that he needed two kilograms of cocaine. The pair agreed to meet in Mobile, Alabama, where, on the first weekend of May 1986, Mr. Beverly paid Suarez $52,000 in cash for two kilograms of cocaine. Suarez travelled to Chicago two weeks later at Mr. Beverly's request to deliver another two kilograms of cocaine. They met at Somons Lounge, another one of Mr. Beverly's properties, on May 17. Mr. Beverly telephoned George Brown, who appeared at Somons with $27,000 in cash, enough for one kilogram of cocaine. Suarez took the cash and gave the cocaine to Mr. Beverly, who instructed Mr. Brown to take the drugs back to the Mayfield house.

This routine was repeated throughout the summer and fall of 1986. On June 21, Suarez and Mr. Beverly met at Tit's. Suarez said hello to Diane Griffin, who was working behind the bar, then accompanied Mr. Beverly to the back of Blacon's Liquor Store. Following a telephone call from Mr. Beverly, Mr. Brown arrived with $27,000 in cash. Mr. Beverly purchased one kilogram of cocaine, which he gave to Mr. Brown with directions to return to the house. On July 20, Mr. Beverly and Suarez waited at Blacon's until Mr. Brown arrived with, on this occasion, $10,000. Although Suarez charged $27,000 per kilogram, he gave Mr. Beverly a full kilogram of cocaine and said he would get the rest of his money later. On July 30, Suarez went to Somons Lounge to collect the debt. Mr. Beverly stated that

---

**3.** Like the Sangamon house, the Mayfield property was outfitted as a gambling establishment.

**4.** Wesley's Drive–In, George Brown's business, is located on the property adjoining the Mercedes bar. The bar originally was named Somons,

but was renamed Mercedes sometime in 1986. Because another establishment called Somons Lounge is involved in this case, the original Somons will be referred to as Mercedes.

he did not have the money but planned to gamble that night; the next morning, Mr. Beverly gave Suarez $10,000 in cash. On both August 9 and 24, Mr. Beverly purchased one kilogram of cocaine with money delivered at Mr. Beverly's request by George Brown. The first transaction took place at Somons with a purchase price of approximately $28,000; the second took place at Blacon's with a price of $27,000. On both occasions, Mr. Beverly gave the drugs to Mr. Brown with instructions to return to the house.

Mr. Beverly made two drug purchases in October. On October 18, Suarez and Mr. Beverly met at Somons Lounge, then drove to a woman's house and picked up a bag of cash. They then returned to Somons, where Mr. Brown was waiting with another bag of money. Together, the bags contained approximately $32,000 in cash, for which Mr. Beverly received a kilogram of cocaine. On his next trip to Chicago, Suarez met Mr. Beverly at Blacon's Liquor Store.

The last meeting between Mr. Beverly and Suarez took place in Florida on November 7, 1986. Suarez had completed a sale of one kilogram of cocaine to Mr. Beverly's associate, Joseph McCorkle, before Mr. Beverly and several friends arrived in Miami for a football game. Suarez had a brief discussion with Mr. Beverly to explain that McCorkle had left Florida with the cocaine. The following weekend, on November 17, 1986, Suarez was arrested in Las Vegas, Nevada for possession with intent to distribute three kilograms of cocaine.

Evidence regarding these defendants' narcotics transactions also was provided by Johnny Davis, a paid informant for the DEA.[5] At the time he began working for the DEA, Davis had known Mr. Beverly for more than twelve years. On March 24, 1986, Davis went to the Mercedes bar to arrange the purchase of one ounce of brown heroin. Davis met with Willie Jor-

dan and, in order to get a DEA agent involved, stated that he had a friend interested in buying some heroin. Two days later, Davis returned to Mercedes with undercover DEA agent Herbert Milton. They spoke with Mr. Beverly, who made two calls from a private phone behind the bar, during one of which Davis heard Mr. Beverly ask whether "Johnny is still all right." Tr. at 242. Mr. Beverly spoke privately to Willie Jordan for a few minutes, after which Jordan handed a package to Davis. Davis observed that the package was a clear plastic bag containing what looked like brown heroin. He passed the bag to Agent Milton and gave Jordan $950. Laboratory tests later revealed that the bag contained 24.93 grams of 2.6% heroin.

On April 1, 1986, Davis went to Mercedes and negotiated a purchase of three ounces of heroin. Davis and Agent Milton returned to the bar the next day and paid Jordan $2,700 for a bag containing 75.50 grams of 2.5% heroin. A month later, on May 2, Davis and Agent Milton went back to Mercedes. They informed Mr. Beverly that they were there to buy three ounces of heroin. Agent Milton ultimately purchased 75.95 grams of 3.4% heroin from Jordan for $2,700. Davis returned to Mercedes on June 24 and asked Mr. Beverly to contact Willie Jordan. Mr. Beverly made several phone calls from the private line behind the bar. When Jordan arrived, he had a private conversation with Mr. Beverly and then told Davis that the package he had ordered was ready. The next day, on June 25, Davis and Agent Milton went to the bar together and purchased a bag of heroin from Jordan for $1,800. Laboratory tests showed that the bag contained 51.28 grams of 2.7% heroin. This was the last purchase from Jordan and Mr. Beverly, although both Davis and Agent Milton attempted to arrange more transactions.

---

**5.** Davis began working for the DEA in mid-March of 1986, after moving out of his home due to arguments with his wife. The quarrels concerned Mrs. Davis' relationship with Betty McNulty, who used drugs in the Davis home and persuaded Mrs. Davis to pick up more drugs for her. At the time of trial, Davis had been paid some $37,000 by the DEA for information supplied in this and other narcotics investigations. He was to receive an additional $10,000 following the trial, conditioned on his giving truthful testimony.

### b. *Betty McNulty*

At the time Johnny Davis began working for the DEA, he had known Ms. McNulty for more than fifteen years. On August 6, 1986, Davis met with Ms. McNulty at the offices of Blacom Corporation, a company controlled by Alex Beverly, and told her that he had a friend interested in buying half an ounce of cocaine at a good price. Ms. McNulty responded that the price would be $900. On August 11, Davis placed several telephone calls to Ms. McNulty that were recorded from the DEA offices. During the first call, Ms. McNulty indicated that she was having trouble getting the cocaine from Willie Jordan but would continue to try. In the second call, Ms. McNulty initially expressed anger with Davis because she believed that he had spoken poorly of her to his wife the night before, and suggested that she might not set up the transaction. After Davis explained that she had misunderstood, Ms. McNulty apparently calmed down and returned to the topic of the cocaine sale. She informed him that Jordan was not home and told him to call back later. She also asked Davis whether he wanted the cocaine "[a]ny special way." Govt. Ex. T–3b at 5. He said that he wanted it in rock form, but Ms. McNulty advised him that "when you get it like that ya get less." *Id.* She explained that she previously had obtained cocaine for a friend in powder form at a better price and a larger quantity than in rock form. *Id.*[6] On the morning of August 12, Davis placed another recorded telephone call to Ms. McNulty. He then was fitted with a body recorder and proceeded to Ms. McNulty's home. Davis counted out $900 and gave it to Ms. McNulty, who recounted the money and then handed him a clear plastic bag filled with white powder. Ms. McNulty commented that she had obtained the cocaine from Willie Jordan. Laboratory tests revealed that the bag contained 13.05 grams of 90% pure cocaine.

Two weeks later, on August 27, Davis purchased a second bag of cocaine from Ms. McNulty. On this occasion, Davis met Ms. McNulty at the Blacom offices. He counted out the money he had brought and, after Ms. McNulty had recounted it, he received a clear plastic bag containing 27.-70 grams of 89% pure cocaine. Ms. McNulty wrapped up the plastic bag in several magazines, placed the package in a shopping bag, and warned Davis to get off the street quickly. She also demonstrated how he should carry the bag so that no one would think it contained drugs or anything else of value.

### 2. Other drug-related evidence

During the investigation of this case, DEA agents searched an apartment located at 5436 West Division Street in Chicago. The telephone at that address was listed in George Brown's name. Pursuant to a search warrant, agents seized documents and other items. Several of the documents bore Mr. Brown's name and the 5436 West Division address, including a gas bill, a real estate tax bill, and a business card for Wesley's Drive–In. The agents also recovered weapons, money, narcotics, and drug paraphernalia, including: two automatic guns and thirty-one rounds of ammunition; three knives; $1,400 in cash; quantities of white and brown cocaine; a triple beam scale; a steel pot containing a razor blade, glassine envelopes, and cutting powder; a blender, sifter, and spoon, each of which contained heroin with traces of cocaine and quinine.

A DEA expert testified that the equipment used for cutting drugs includes blenders and sifters, which are used to break up firmly packed cocaine and mix it with other substances, and razor blades, which are used to divide up quantities of drugs for distribution. In addition, the expert testified that the type of scale recovered from 5436 West Division would be used by

---

**6.** Ms. McNulty actually stated that "they gave [the friend for whom she obtained the cocaine] a nice play.... [T]hey didn't specify in the rock form and it was ya know, over what they had." Govt. Ex. T–3b at 5. In drug parlance "nice play" means that the price is decreased somewhat and "over" means that the buyer receives slightly more than he paid for. Tr. at 326–27.

a drug dealer rather than a user, and that drug dealers tend to be armed with the type of guns and knives recovered by the government to protect both themselves and their narcotics.

### 3. Financial considerations

#### a. *Blacom Corporation*

##### i.

Blacom, a construction company, was incorporated by Perry Beverly on January 25, 1985. Perry, who is Alex Beverly's brother, became Blacom's sole shareholder, director, president, secretary, and treasurer upon incorporation. He was twenty-six years old at the time and, although he had some experience in construction, he had no prior business experience. Corporate records reveal that 1,000 shares of stock were issued to him at a total value of $1,000. However, Perry never invested any money in Blacom. During Perry's tenure with the company, Blacom purchased property and opened food and liquor stores. Although Perry was in charge of the whole enterprise, he had no idea how much revenue Blacom received for its various construction jobs or in what form payment was made, nor did he know where the money came from to open the stores or purchase property. He resigned from Blacom in August of 1985 and transferred the company, together with his shares, to Betty McNulty. Ms. McNulty received an additional 29,000 shares when she took over although, like Perry Beverly, she never made any capital contributions.

A Blacom corporate meeting was held in January of 1986. The meeting was attended by Eclorise Scott, William White, Yvonne Elliott, Joe Gibbs, Betty McNulty, Alex Beverly, and Larry Saska, an attorney who represented both Blacom and Mr. Beverly. In that meeting, Mr. Beverly announced that Scott, White, Elliott, and Gibbs would become ten percent shareholders of the company and Ms. McNulty would become a sixty percent shareholder. None of these parties purchased their shares or made other investments. Mr. Beverly also suggested who would become officers of Blacom. Although Mr. Beverly was not a record shareholder or a Blacom officer, all of his suggestions were adopted without discussion.

A bookkeeper from Statewide Accounting prepared Blacom's corporate and sales tax returns for 1985 and 1986. She testified that she realized in early 1986 that Blacom's expenditures far exceeded its income. By examining receipts from Blacom's liquor purchases, it became clear that, because the company had made payments to distributors in cash, there was extra cash on hand that did not go through the bank and was not reflected in corporate accounts. William White, one of the participants in Blacom's January 1986 meeting, suggested that Statewide mark up the bank deposits to account for any discrepancy. Statewide, which also worked for George Brown, was informed that Mr. Brown owned Wesley's Drive–In and that all work concerning his account was to be picked up at the Blacom offices. However, the fire insurance for Wesley's Drive–In was in Alex Beverly's name.

##### ii.

Blacom had extensive holdings by the time Ms. McNulty took over in 1985. In 1984, Mr. Beverly had purchased the real estate located at 5436–38 West Division Street in Chicago. Larry Saska paid the $40,000 balance due at the closing with checks and cash given to him by George Brown. Mr. Beverly instructed Saska to transfer the property to a land trust, the beneficiary of which was Diane Griffin, but later directed Saska to place the property into a trust having Blacom as its beneficiary. Because less than $100 consideration was paid for each of these transfers, they were tax exempt. In September of 1984, Mr. Beverly paid $8,000 in cash for the property at 1811 South Harding, the house in which Betty McNulty later lived. Ms. McNulty was the named grantee in the 1984 deed, although Mr. Beverly directed Saska to transfer the property into Diane Griffin's trust and then into Blacom's trust. Mr. Beverly also had the properties located at 1812 South Millard and 1801–07 South Lawndale placed originally in Diane Grif-

fin's trust and later transferred to Blacom's trust.

In March of 1985, Mr. Beverly became the beneficiary of a trust that held property on West Ogden Avenue, the location of Blacom's offices. In July of that year, he transferred this interest to Blacom for no consideration. His beneficial interest in a building which housed one of the Blacom food and liquor stores similarly was transferred to Blacom in July of 1985 for no consideration. Finally, the property housing Somons Lounge was acquired by Blacom in 1985. Mr. Beverly never held a property interest in this particular land, although he was present during the contract negotiations for its purchase. Mr. Beverly also was involved in several rental properties. In 1984, he negotiated an $800 monthly rental for what became the Mercedes bar. The lease identified Ms. McNulty as lessee and Mr. Beverly as guarantor. Mr. Beverly also negotiated an agreement with the owner of a liquor and grocery store whereby Mr. Beverly would purchase the store's assets for $25,000 and rent the building for $3,500 per month. The original lease named Blacom as the lessee, but the lease later was changed at Mr. Beverly's direction to name Betty McNulty as the lessee.

In addition to his other connections with these properties, Mr. Beverly arranged for essentially complete renovations of three separate properties, including Somons Lounge. The gutted building that eventually housed Somons had to be reduced to bare brick and started over. Mr. Beverly paid the workers on these projects in cash and also paid for the construction materials.

### b. Betty McNulty

Ms. McNulty and Mr. Beverly lived together from the late 1970s through at least 1985. As described above, Mr. Beverly placed in Ms. McNulty's name the leases for two rental properties and the deed for the house they shared. Ms. McNulty, accompanied by Mr. Beverly, purchased the property at 1812 South Millard for $5,000

to 6,000 cash. She became the titleholder of a late-model Mercedes Benz purchased and driven by Mr. Beverly. She also received public assistance from at least May 1982 to February 1984. Bank records from 1984–86 reveal that the minimum amount of checks drawn on her personal checking account were: $27,441.92 in 1984; $65,-981.67 in 1985; $57,071.94 during the first eleven months of 1986. During this same three-year period, Ms. McNulty wrote $33,-484.09 in checks payable to Mr. Beverly's American Express account. All payments on Mr. Beverly's American Express card were made from Ms. McNulty's bank account.

Betty McNulty's 1985 federal tax returns [7] revealed that she held Somons and one of the Blacom food and liquor stores as sole proprietorships. In 1986, she reported $22,000 in income from Blacom, although Blacom's corporate tax return for the fiscal year ending May 1986 showed that no company officers had received any compensation.

### c. Diane Griffin

For at least part of 1986, Ms. Griffin and Mr. Beverly shared an apartment located above Tit's lounge. The building originally was owned by Burl Price, who sold it to Haley Rainey. In 1980 or 1981, Rainey told Price that he wanted to pay off the debt because he was selling the building to someone else. When Price received a notice of delinquent taxes on the property several months later, he called Alex Beverly, who picked up the notice and said he would take care of it. On August 30, 1983, Ms. Griffin obtained the beneficial interest in a land trust containing both this property and the adjoining building, which houses one of the Blacom food and liquor stores. Ms. Griffin received public assistance from at least 1978 until October of 1984, when her benefits were cancelled because the Illinois Department of Public Aid (IDPA) could not locate her. In September of 1983, several weeks after receiving the interest in the land trust discussed above,

---

7. Ms. McNulty did not file returns for the years 1981–84.

Ms. Griffin signed an IDPA document indicating that she had no income or resources.

Ms. Griffin did not file tax returns in 1981–82 or 1986, although Mr. Beverly told Suarez in March of 1986 that he had purchased Tit's for her. The government also introduced other evidence concerning Ms. Griffin's assets. For example, in September 1985, Mr. Beverly purchased a $35,000 Jaguar for Ms. Griffin. The Jaguar, which carried the license plate "Alex, Jr.," was purchased in Ms. Griffin's name but paid for by Mr. Beverly, primarily in cash.[8] Bank records reveal that most of the checks drawn on an account they held jointly were for business expenses such as liquor purchases and electric bills. The minimum amount of checks drawn on the account were: $1,975.43 in 1983; $81,354.80 in 1984; $47,460.65 in 1985; $7,847.08 in 1986.

### d. *Alex Beverly*

According to Perry Beverly, the only "regular" job Alex Beverly held from 1980–86 was a delivery man for some period in 1982 or 1983.[9] Robert Beverly testified that his brother Alex did some construction work in 1985 or 1986. Ronald Smith, who identified Mr. Beverly as "one of [his] best friends," knew only that Mr. Beverly did some construction work in the early 1980s. Tr. at 1725. However, in addition to the extensive expenditures and financial transactions noted above, Alex Beverly spent money on clothes and other items. For example, in November 1985, he purchased a fur coat for a cash price of $1,395. He bought a second fur jacket in December, monogrammed "Mr. Beverly" in the lining, for a cash price of $3,995. Suarez warned Mr. Beverly to be careful with the way he handled his money, but Mr. Beverly responded that he was "licensed under his women and some of his apart-

ments to do that kind of thing and keep it isolated from the business." Tr. at 853. Although Mr. Beverly did not file tax returns from 1982–86, the IRS was able to estimate, based on the evidence regarding his drug transactions, that his adjusted gross income in 1986 was $224,500.

### 4. Suarez letter

In approximately September of 1987, after the original indictment had been returned against the defendants, Peter Suarez wrote a letter (the Suarez letter) to the Assistant United States Attorney (AUSA) who tried this case. On June 2, 1988, the AUSA notified defense counsel of the letter's existence, but informed counsel that she could not locate it. She recalled that she had given the letter to one of the DEA agents involved in the investigation, but in preparing for trial they were unable to locate either the original letter or a copy. She believed that the letter was approximately three handwritten pages. The AUSA summarized her recollection of the letter as follows:

> The salutation on the letter was "Dear Andrea". Suarez went on to say that he believed he could address me by my first name because he felt that we were "working for the same team". Suarez reiterated his desire to cooperate with the government and added "I want to do everything I can to help you convict Beverly". Suarez then expressed some concerns about his safety at the institution where he was housed. I do not remember the specifics of those concerns. Suarez closed the letter with a request that he be moved to a different facility.

Appellants' Consolidated Br. at App. 5. At trial, Suarez was unable to add any further detail to the AUSA's recollections.

---

**8.** An initial down payment of $500 in cash was made on September 16, 1985. A $7,000 payment was made on September 23, 1985 by check, followed by cash payments of $8,000 and $7,000 on September 30 and October 1, respectively. On October 2, 1985, another cash payment of $6,000 was made, and the final payment of $7,186 was made in cash on the next day, October 3.

**9.** When Perry Beverly testified before the grand jury, he stated that he had never known his brother to have legitimate employment; he did not mention that his brother had worked as a delivery man.

On June 9, 1988, the day the trial began, Alex Beverly and George Brown moved to bar Suarez' testimony based on the government's failure to disclose the letter. They also served a trial subpoena upon the AUSA to appear as a witness on behalf of Mr. Beverly. The government moved to quash. The court denied the motion to bar and granted the government's motion to quash. The defendants subsequently moved to strike Suarez' testimony or, in the alternative, for a hearing "to ascertain the nature of the Government's misconduct in losing this important evidence, and to determine appropriate sanctions." R.253 at 1. Following oral argument by the defendants and the government, the district court denied the alternative motions.

## B. *The Trial*

At the trial, which extended over a five week period, the government established the facts set forth above. The government also introduced various charts summarizing information obtained from pen registers attached in 1986.[10] The director of technical operations for the Chicago office of the DEA testified that he had supervised the installation of at least 50 pen registers and had personally installed over 500 such devices. Having been transferred to the Chicago office in 1986, he could not testify from personal knowledge that the pen registers used in this case were connected properly. However, he testified that pen register installation procedures are uniform throughout the United States and that, in his experience, the DEA had never attached a pen register to the wrong telephone number. The records generated in this case revealed that, in the course of a three week period in December 1986, forty-nine calls were placed from the Mercedes bar to Wesley's Drive–In and seven calls were made from the bar to George Brown's address.

After the trial began, the defendants learned that telephone calls recorded in a separate Federal Bureau of Investigation (FBI) case might involve Mr. Beverly. Mr. Beverly's attorney requested that he be given a continuance to listen to the tapes. The district court determined that the tapes were not discoverable and denied the request. At trial, Mr. Beverly presented evidence that he had made money gambling. Hurley Teague testified that he built a dice table for Mr. Beverly in early 1986. That table and another dice table were used at Somons Lounge.[11] Teague stated that he helped wire the second table and install a magnetic coil in its false bottom. He also testified that he placed a large magnet in a stool used with the table he had built and observed that when the stool was placed close to the table, the dice would come up as seven's or eleven's. Teague stated that he observed Mr. Beverly and others playing dice, once at the table he had constructed and once at the second table. On at least one of those occasions, there was "a lot of money" on the table. Tr. at 2824.

Tim Robinson also testified about Mr. Beverly's gambling background. Robinson stated that he and Mr. Beverly operated a gambling house on Sangamon Street from late 1979 until 1984. As the housemen, they took ten percent of all bets. Most of the gambling took place at the dice tables, although card games also were played. After the police closed down the house, Robinson "wrote" horses and the lottery for Mr. Beverly until 1986.[12] Mr. Beverly received seventy-five cents of every dollar bet and paid the winners; Robinson received the remaining twenty-five cents but did not have any pay-off responsibilities. Robinson testified that his monthly income from the Sangamon business was $15,000–

---

10. A pen register is an electronic device that registers all telephone numbers dialed from the telephone line to which the device is connected. Tr. at 2442.

11. The second dice table replaced the table built by Hurley Teague. Teague testified that he moved the original table from Somons to the Blacom warehouse on West Ogden when the second table arrived. However, no dice tables like those described by Teague were discovered when Somons and the Blacom properties were searched in July of 1987 as part of the investigation in this case.

12. Robinson wrote up bets as they were placed and collected the bet money.

20,000 and that his net income for those 4 to 5 years was well over $100,000 per year. He stated that, from 1984–86, when he wrote bets, he made at least $300,000 per year. Gary Hubbard also testified that he had gambled with Mr. Beverly since 1969. He recalled that Mr. Beverly won approximately $25,000 one night in 1985 and approximately $30,000–35,000 one day in May 1987.

Finally, Mr. Beverly called Dr. Chester Layne, Mr. Beverly's dentist and a former cocaine addict. The government objected to the testimony defense counsel sought to elicit from Dr. Layne. According to the defendant's offer of proof, Dr. Layne would have testified that Mr. Beverly counseled him on his cocaine addiction and that he sought professional help as a result. Dr. Layne also would have testified that he never saw Mr. Beverly buy or sell cocaine, and that although drugs were sold outside of Somons, Mr. Beverly was not the seller. The district court excluded this testimony on hearsay and relevance grounds.

Betty McNulty presented two witnesses to support her entrapment defense. Ms. McNulty's mother testified that in August 1986, Johnny Davis, the DEA informant, called Ms. McNulty's home as often as four or five times each day. Yvonne Elliott, Blacom's bookkeeper, also testified that, in August 1986, Davis frequently telephoned Ms. McNulty at the company's offices and came by in person to see her several times.

Diane Griffin called three women who testified that they were employed by Tit's lounge and knew Mr. Beverly. They all stated that Mr. Beverly never told them how to do their jobs and that he paid for his drinks like the other customers. The defendants [13] also presented testimony from James Ragan, the DEA agent who interviewed Peter Suarez in Las Vegas on January 7, 1987. Agent Ragan acknowledged that his report from the first interview with Suarez did not mention several points on which Suarez testified at trial.

13. George Brown did not call any witnesses specifically on his behalf.

## C. Jury Instructions

The district court instructed the jury on July 13, 1988. With regard to the continuing criminal enterprise charge against Alex Beverly, the court instructed the jury not to consider Diane Griffin, Johnny Davis, or Agent Milton in determining whether Mr. Beverly acted in concert with five or more people. The court denied Mr. Beverly's request to include Peter Suarez in the list of persons the jury could not consider. The court also denied Mr. Beverly's request that the jury be required to return special verdicts identifying the five people found to have participated in the continuing criminal enterprise.

During the trial, Ms. Griffin moved for severance, which the district court denied. She claimed that the government's only theory was her alleged participation in a conspiracy to evade taxes because there was no proof that she knew Mr. Beverly was a drug dealer. The government maintained that such proof was not necessary and that the jury could return a guilty verdict under either the drug or tax arm of the fraud conspiracy. Ms. Griffin subsequently objected to the government's proposed conspiracy instruction on the ground that it did not differentiate between the drug and tax objectives. She submitted an alternate instruction that would have required the jury to (1) find that she knew that the object of the conspiracy was to impede the IRS in ascertaining Mr. Beverly's taxes, and (2) identify, via special interrogatories, the objective of which the jury believed she had knowledge. The district court denied both her jury instruction and requested special interrogatories. After deliberating, the jury returned guilty verdicts on all but three counts. [14]

## D. Sentencing

Following a September 23, 1988 sentencing hearing, the district court set forth its factual conclusions and imposed sentence. Based on their respective convictions, Alex

14. Mr. Beverly and Mr. Brown each were acquitted of three counts of possession of cocaine with the intent to distribute.

Beverly received a 35 year sentence, lifetime special parole, and a $100,000 fine; George Brown was sentenced to 20 years imprisonment and lifetime special parole; Betty McNulty received a 3 year sentence followed by 10 years of special parole; Diane Griffin received a suspended sentence and was placed on probation for 5 years on the condition that she reside and participate in the Salvation Army's work release program for the first 6 months of probation, obtain and maintain employment, and perform 500 hours of community service.

With specific regard to George Brown, the only defendant who challenges his sentence, the court determined that:

> [b]ased on the evidence in this case, it's clear to the Court you were second in command. You've been involved in this enterprise since at least 1979 and through 1987. You ran at least one of the smoke houses. You were the one that brought the cash and retrieved large quantities of narcotics on a regular and frequent basis. There were numerous firearms found in your apartment.

Sentencing Tr. at 49.[15]

## II

## ANALYSIS

All the defendants challenge several decisions made by the district court. Each defendant also raises additional issues on appeal. We shall analyze the combined claims first, then address each defendant's separate contentions.

### A. *Consolidated Arguments*

#### 1. Peter Suarez' testimony

■ Alex Beverly and George Brown challenge the district court's denial of their motion to strike Suarez' testimony.[16] As we have noted previously, *see supra* p. 346, a week before trial, the Assistant United States Attorney disclosed to defense counsel that she had received a letter from Suarez that offered to "do everything I can" to assist in the conviction of Mr. Beverly. The letter had been lost and a search had failed to uncover it. Mr. Beverly and Mr. Brown contend that the government failed promptly to disclose the Suarez letter and that the government's subsequent loss or destruction of that letter deprived them of due process.

During the discovery process, the government must disclose evidence favorable to the defendant that, if suppressed, would deprive the accused of a fair trial. *Brady v. Maryland*, 373 U.S. 83, 86–87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963); *see United States v. Bagley*, 473 U.S. 667, 674–75, 105 S.Ct. 3375, 3379, 87 L.Ed.2d 481 (1985). This duty extends both to exculpatory evidence and to evidence that might be used to impeach the government's witnesses. *Bagley*, 473 U.S. at 676, 105 S.Ct. at 3380; *Giglio v. United States*, 405 U.S. 150, 153–54, 92 S.Ct. 763, 765–66, 31 L.Ed.2d 104 (1972). The duty stems from the fact that nondisclosure of such evidence violates due process. *Bagley*, 473 U.S. at 675, 105 S.Ct. at 3379; *Brady*, 373 U.S. at 86, 83 S.Ct. at 1196. The government does not dispute its obligation to disclose the existence of the Suarez letter to the defendants.

We do not believe that the defendants were denied due process of law by the timing of the disclosure. In *United States v. Allain*, 671 F.2d 248, 254–55 (7th Cir. 1982), where the defendant raised a due process issue similar to the claim in this case, the court noted that

> the standard to be applied in determining whether the delay in disclosure violates due process is whether the delay prevented defendant from receiving a fair trial. "As long as ultimate disclosure is made before it is too late for the defendant[ ] to make use of any benefits of the evi-

---

**15.** The government had argued at the sentencing hearing that "Mr. Brown wasn't involved in a small level. He wasn't a mope who just delivered. He was up there at the top. And because of that, Judge, and because of the fact that he has a prior record and because of the fact that there really is—are no really mitigating factors for Mr. Brown." Sentencing Tr. at 20.

**16.** The district court earlier had denied the defendants' motion to bar Suarez' testimony. We affirm that denial for the same reasons we uphold denial of the motion to strike.

dence, Due Process is satisfied." *United States v. Ziperstein*, 601 F.2d 281, 291 (7th Cir.1979), *cert. denied*, 444 U.S. 1031, 100 S.Ct. 701, 62 L.Ed.2d 667 (1980).

*Id.* at 255 (citation omitted); *see also United States v. Weaver*, 882 F.2d 1128, 1141 (7th Cir.) (collecting cases), *cert. denied*, — U.S. —, 110 S.Ct. 415, 107 L.Ed.2d 380 (1989). Here, the government notified defense counsel a week before trial of the existence of the Suarez letter and its contents.[17] The defendants have suggested no particular prejudice in the preparation of their defense. Indeed, the record reveals that the defense, in vigorous cross-examination of Suarez, was able to make good use of the impeaching statements admittedly contained in the letter. Finally, because there is no evidence that the government intentionally destroyed the letter or engaged in any misconduct, we shall not disturb the district court's finding that the government did not act in bad faith. Thus, the fact that the Suarez letter was lost does not alter the resolution of this issue. *See United States v. Zambrana*, 841 F.2d 1320, 1341–42 (7th Cir.1988) (lost or destroyed evidence does not violate due process absent " 'official animus' " or " 'conscious effort to suppress exculpatory evidence' ") (quoting *California v. Trombetta*, 467 U.S. 479, 488, 104 S.Ct. 2528, 2533, 81 L.Ed.2d 413 (1984)).

■ We also do not believe the district court abused its discretion in denying the defendants' request for a hearing, which was brought as an alternative to their motion to strike. An evidentiary hearing was required only if the defense had presented specific facts raising a significant doubt about the propriety of the government's conduct. *See United States v. Sophie*, 900 F.2d 1064, 1071 (7th Cir.1990) (defendant claimed government acted in bad faith by violating alleged plea agreement; denial of evidentiary hearing upheld); *United States v. Valona*, 834 F.2d 1334, 1340 (7th Cir. 1987) (alleged misconduct for preindictment delay; no error to deny hearing). In this case, the defendants suggested that there had been government misconduct but offered nothing more in support of that claim than the fact that the letter had been in the government's possession and later could not be found. However, "this alone is insufficient to establish bad faith." *Zambrana*, 841 F.2d at 1343. Because the defendants failed to present sufficient evidence of government misconduct, the district court was not required to conduct a hearing on the issue.

2. Jury deliberations

a. *defendants' motion for mistrial*

The jury began deliberating on the morning of July 14, 1988. On the second day of deliberations, the jury wrote three notes to the court. At 11:00 a.m. the jury asked whether a defendant who was acquitted on all remaining counts could be found guilty on count one. Approximately forty-five minutes later, the jury asked how to report a vote that is not unanimous, "[f]or instance a count of eleven guilty [and] 1 not guilty." R. 302. While the court and counsel discussed the second note, the court security officer stated that the jurors "feel very strongly that by 2:30 they're going to have a verdict." Tr. at 3697. The court and all counsel agreed at that point that the *Silvern* instruction could be reread to the jury.[18] However, it was not read at

---

17. We have noted that " '[t]here is nothing in *Brady* or [*United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976),] to require that such disclosures be made before trial....' " *United States v. Allain*, 671 F.2d 248, 255 (7th Cir.1982) (quoting *United States v. McPartlin*, 595 F.2d 1321, 1346 (7th Cir.), *cert. denied*, 444 U.S. 833, 100 S.Ct. 65, 62 L.Ed.2d 43 (1979)); *see also United States v. Zambrana*, 841 F.2d 1320, 1340 (7th Cir.1988) (government's failure to disclose exculpatory evidence until just prior to commencement of trial did not violate *Brady* ); *Allain*, 671 F.2d at 254–55 (no *Brady* violation where government disclosed evidence favorable to defense on day before trial began).

18. The *Silvern* instruction, which was read to the jury as part of the formal jury instructions, is derived from *United States v. Silvern*, 484 F.2d 879, 883 (7th Cir.1973) (en banc). The district court in this case gave the instruction as follows:

The verdict here must represent the considered judgment of each juror. Your verdict, whether it be guilty or not guilty[,] must be

that time. A few minutes later the court received another note from the marshal stating as follows: "We have a verdict. Also, the jury, on a separate sheet, listed those counts where they were 11–1. This listing is for your eyes. Do you want that list now?" R.302. Yet, another note, the final note, written at 3:15 p.m., stated, "We cannot reach a guilty or not guilty decision on the attached list of counts. Going beyond this point might involve intimidation." R. 302. Following receipt of the last note, the court, over defense counsel's objection, reread the *Silvern* instruction to the jury at approximately 4:15 p.m. The jury continued to deliberate until 5:00 p.m., then resumed deliberations and reached a verdict on Monday, July 18.

■ Based on the jury's note that "[g]oing beyond this point might involve intimidation," R.302, the defendants moved for a mistrial. They now challenge the district court's denial of this motion. They contend that, once the court knew that the jury had reached a verdict on some counts but was split on others, the court was required to take the verdicts and declare the jury partially hung. For the following reasons, we believe the district court was correct in denying defendants' motion.

The district court has broad discretion with regard to declaring mistrials. Our review is limited to whether the denial of a motion for mistrial constituted an abuse of the district court's discretion. *See United States v. D'Antonio*, 801 F.2d 979, 983 (7th Cir.1986); *see also United States v. Perez*, 870 F.2d 1222, 1227 (7th Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 136, 107 L.Ed.2d 95 (1989). In *United States v. Kwiat*, 817 F.2d 440 (7th Cir.), *cert. denied*, 484 U.S. 924, 108 S.Ct. 284, 98 L.Ed.2d 245 (1987), the trial involved multiple defendants and

lasted for nine days. After only seven hours of deliberation, the jury notified the court that it could not reach a verdict on some of the charges and thought further deliberations would be " 'fruitless.' " *Id.* at 446. This court determined that, because such circumstances do "not compel a district court to grant a mistrial," it was not an abuse of discretion for the district court to instruct the jury to continue deliberating. *Id.*

Similarly, under " 'all the circumstances of [this] case,' " *D'Antonio*, 801 F.2d at 983 (quoting *United States v. Allen*, 797 F.2d 1395, 1400 (7th Cir.), *cert. denied*, 479 U.S. 856, 107 S.Ct. 196, 93 L.Ed.2d 128 (1986)), a mistrial was not compelled by the fact that the jury thought it was deadlocked. Here, the jury had deliberated for less than two days—approximately twelve hours—following a trial that had extended over five weeks and involved six defendants and twenty-three counts. The district court "has great discretion to determine how long deliberations should continue." *Kwiat*, 817 F.2d at 446. That discretion was not abused in this case. We therefore shall not disturb the court's refusal to declare a mistrial.

b. *the Silvern instruction*

■ Finally, the defendants assert that the district court erred by rereading the *Silvern* instruction, particularly in light of the fact that the court knew the jury was split eleven to one on some counts. We rejected this same argument in *United States v. Gabriel*, 597 F.2d 95 (7th Cir.), *cert. denied*, 444 U.S. 858, 100 S.Ct. 120, 62 L.Ed.2d 78 (1979). There, we concluded that the district court did not abuse its discretion by rereading the *Silvern* charge when the jury indicated that it was dead-

unanimous. You should make every reasonable effort to reach a verdict. In doing so you should consult with one another, express your own views and listen to the opinions of your fellow jurors. Discuss your differences with an open mind. Do not hesitate to re-examine your own views and change your opinion if you come to believe it is wrong.

But you should not surrender your honest beliefs about the weight or effect of evidence solely because of the opinions of your fellow

jurors or for the purpose of returning a unanimous verdict. The 12 of you should give fair and equal consideration to all of the evidence and deliberate with the goal of reaching an agreement which is consistent with the individual judgment of each juror. You are impartial judges of the facts. Your sole interest is to determine whether the government has proved its case beyond a reasonable doubt. Tr. at 3715; *see United States v. Byrski*, 854 F.2d 955, 958 n. 4 (7th Cir.1988).

locked after less than three hours of deliberation following a six day trial. In *Gabriel*, as here, the district court knew that the jury was split eleven to one against the defendant. *Id.* at 100. Similarly, in *Kwiat*, where the jury thought it was deadlocked after less than three hours of deliberation following a nine day trial, the district court's decision to reread the *Silvern* charge was upheld as within that court's sound discretion. 817 F.2d at 446; *see also United States v. Byrski*, 854 F.2d 955, 962 n. 11 (7th Cir.1988) (no abuse of discretion where court repeated *Silvern* charge *twice* ).[19] Under the facts of this case, we conclude that the district court did not abuse its discretion by giving the *Silvern* charge. The instruction read here was "perfectly content-neutral and carried no plausible potential for coercing 'the jury to surrender their honest opinions for the mere purpose of returning a verdict.'" *D'Antonio*, 801 F.2d at 983–84 (quoting *United States v. Thibodeaux*, 758 F.2d 199, 203 (7th Cir.1985)).

B. *Individual Appeals*

1. Alex Beverly

a. *continuing criminal enterprise charge*

■ Mr. Beverly first alleges error in the jury instructions. He claims that he did not organize, supervise, or manage Peter Suarez within the meaning of the continuing criminal enterprise (CCE) statute, 21 U.S.C. § 848.[20] He therefore argues that the jury should have been instructed that Suarez could not be considered for purposes of the CCE count. Mr. Beverly claims only that he did not organize, supervise, or manage Suarez; he does not deny that he occupied such a position with respect to at least five people. Therefore, this court's decision in *United States v. Holguin*, 868 F.2d 201, 202–04 (7th Cir.), *cert. denied,* — U.S. ——, 110 S.Ct. 97, 107 L.Ed.2d 60 (1989), disposes of Mr. Beverly's claim. Based on our review of the record, we determine that there was sufficient evidence presented at trial to establish that he in fact organized, supervised, or managed at least five individuals.[21] "That determination ends our inquiry." *Id.* at 204. It is irrelevant whether the evidence was insufficient to establish that Mr. Beverly acted in concert with Suarez. *See id.* at 203.

■ Mr. Beverly also attacks the district court's denial of his request that the jury be required, by the use of special interrogatories, to identify specifically the persons it found Mr. Beverly had organized, supervised, or managed. However, it is well settled that the law "does not make the identity of the five important." *United States v. Markowski*, 772 F.2d 358, 364 (7th Cir.1985), *cert. denied,* 475 U.S. 1018, 106

---

**19.** *Cf. United States v. D'Antonio*, 801 F.2d 979, 983 (7th Cir.1986) (jury indicated inability to reach a verdict after only three hours of deliberation; no abuse of discretion where court sent jury a note ordering further deliberations rather than rereading *Silvern* instruction). We reject the defendants' claim to the extent that it attacks the district court's decision to *read* the *Silvern* charge rather than respond to the jury in writing. *See United States v. Cheek*, 882 F.2d 1263, 1268 (7th Cir.1989) (character of additional instructions rests within district court's sound discretion), *cert. granted on other grounds,* — U.S. ——, 110 S.Ct. 1108, 107 L.Ed.2d 1016 (1990).

**20.** To engage in a CCE, the defendant must occupy "a position of organizer, a supervisory position, or any other position of management" with respect to at least five other persons. 21 U.S.C. § 848. To prove a violation of § 848, the government must show:

(1) a predicate offense violating a specified drug law (2) as part of a "continuing series" of drug violations (3) that occurred while the defendant was acting in concert with five or more people (4) to whom the defendant occupied the position of an organizer or manager and from which series the defendant (5) obtained substantial income or resources.

*United States v. Sophie*, 900 F.2d 1064, 1077 (7th Cir.1990) (quoting *United States v. Markowski*, 772 F.2d 358, 360–61 (7th Cir.1985), *cert. denied,* 475 U.S. 1018, 106 S.Ct. 1202, 89 L.Ed.2d 316 (1986)). Mr. Beverly challenges the third and fourth elements. The court did not identify who *could* be considered for purposes of this count, but instructed the jury not to consider Diane Griffin, Johnny Davis, or Officer Milton.

**21.** Such persons include, at least, Betty McNulty; George Brown; Willie Jordan; Charles Avant; and Mary Pugh, the woman who kept at her house the cash Mr. Beverly used to pay for a kilogram of cocaine on October 18, 1986.

S.Ct. 1202, 89 L.Ed.2d 316 (1986). Therefore, a CCE conviction will stand where those who were organized, supervised, or managed are unidentified. *See id.* ("The CCE statute is directed against all enterprises of a certain size; the identity of those involved is irrelevant."); *see also Holguin,* 868 F.2d at 203 & n. 5 (government not required to prove the identity of five or more persons organized by defendant); *United States v. Moya–Gomez,* 860 F.2d 706, 747 (7th Cir.1988) (quoting *Markowski*), *cert. denied,* —— U.S. ——, 109 S.Ct. 3221, 106 L.Ed.2d 571 (1989). Because the evidence was sufficient to establish that Mr. Beverly acted in concert with at least five people, we affirm the CCE conviction.

b. *district court rulings*

Mr. Beverly challenges three evidentiary rulings made during the trial. Our review of the district court's rulings is limited to whether the court abused its discretion. *See United States v. Nedza,* 880 F.2d 896, 903 (7th Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 334, 107 L.Ed.2d 323 (1989). Mr. Beverly carries "a heavy burden in challenging the trial court's evidentiary rulings on appeal because ' "a reviewing court gives special deference to the evidentiary rulings of the trial court." ' " *United States v. Shukitis,* 877 F.2d 1322, 1327 (7th Cir. 1989) (citation omitted)." *United States v. Briscoe,* 896 F.2d 1476, 1489–90 (7th Cir. 1990). We therefore shall uphold such rulings unless the defendant demonstrates that the district court abused its discretion. *Id.* at 1490.

Mr. Beverly claims first that the district court erroneously barred the testimony of Dr. Chester Layne. Had he been permitted to take the stand, Dr. Layne would have testified that (1) he sought professional help for his cocaine addiction as a result of Mr. Beverly's counseling, and (2) he never saw Mr. Beverly buy or sell cocaine outside of Somons Lounge. This matter needs little elaboration. As the district court recognized, hearsay problems aside, the evidence simply was not relevant. The testimony would have revealed nothing about Mr. Beverly's activities at Somons. Moreover, Mr. Beverly undoubtedly could have called any number of additional witnesses to testify that they never had purchased cocaine from him. Such proof of an assertion by a negative is inadmissible.[22] Accordingly, the district court did not abuse its discretion by excluding Dr. Layne's testimony.[23]

Mr. Beverly next contends that the government failed to show that the DEA properly connected the pen register used to monitor the phone line at Somons Lounge and that the district court therefore improperly introduced evidence obtained through its use. This claim has no merit. The government laid an ample foundation for the introduction of this evidence through the director of technical operations for the Chicago office of the DEA. Although the director personally did not install the device used in this case, he testified that the installation procedure was standardized throughout the United States and that he had never known the DEA to misconnect a pen register. Moreover, the tape printed out by the device indicated

---

**22.** *See United States v. Troutman,* 814 F.2d 1428, 1454 (10th Cir.1987) (defendant indicted for extortion of specific company offered evidence that he had not extorted other companies; evidence properly excluded as irrelevant). Moreover, even relevant evidence may be excluded in some instances. *See* Fed.R.Evid. 403. Here, "[t]he relevance of the offered proof to the charges against [the defendant] is so tenuous that the district judge was entitled to conclude that its probative value would be clearly outweighed by its effect in confusing the jury by extending an already very long trial. Fed.R. Evid. 403." *United States v. LaFevour,* 798 F.2d 977, 980 (7th Cir.1986).

**23.** Mr. Beverly's claim also fails to the extent that he argues Dr. Layne's testimony was admissible as character evidence. This argument was not made to the district court and cannot be made now. *See United States v. Nedza,* 880 F.2d 896, 904 (7th Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 334, 107 L.Ed.2d 323 (1989). In addition, Mr. Beverly's character was not an essential element in this case; character evidence may not be proved by specific instances of conduct, such as Mr. Beverly sought to introduce through Dr. Layne, unless character of a person is "an essential element of a charge, claim or defense." Fed.R.Evid. 405(b).

that it was in fact connected to the phone line serving Somons Lounge. Accordingly, we conclude that the district court did not abuse its discretion by admitting evidence derived from the pen registers.

In his final challenge to the district court's evidentiary determinations, Mr. Beverly claims that Burl Price improperly was allowed to testify to hearsay statements. Price testified that (1) he sold a building to Haley Rainey under a land contract, (2) when Rainey made the final payment in 1980 or 1981, he told Price that he was selling the building to someone else, and (3) when Price received a notice of delinquent taxes on the property, he called Alex Beverly, who picked up the notice and said he would take care of it. Mr. Beverly argues that Price's second statement constituted impermissible hearsay. Although this testimony encompasses out of court statements between Price and Rainey, the district court determined that those statements were not offered to prove the truth of the matter asserted. We agree and conclude that the government's use of the testimony—to explain why Price contacted Mr. Beverly about the tax notice—was permissible. *See* Fed.R.Evid. 801(c); *see also Lee v. McCaughtry*, 892 F.2d 1318, 1324 (7th Cir.) (statements introduced "merely to give the context of the defendant's statements are not hearsay"), *cert. denied,* — U.S. ——, 110 S.Ct. 3244, 111 L.Ed.2d 754 (1990). Moreover, the court directed the jury to consider the challenged testimony only as an explanation of Price's subsequent actions and not for the truth of the contents of his conversation with Rainey. Because there is not an "overwhelming probability" that the jury in this case was unable to follow the court's limiting instruction, the jury must be presumed to have followed it. *See Greer v. Miller*, 483

U.S. 756, 766 n. 8, 107 S.Ct. 3102, 3109 n. 8, 97 L.Ed.2d 618 (1987); *Lee*, 892 F.2d at 1325.

Mr. Beverly also challenges the denial of several motions made after he discovered that telephone calls recorded in a separate investigation might contain his statements.[24] His attorney asked to hear the tapes and requested a continuance to do so. Following an *in camera* review of the tapes, the district court concluded that they were not discoverable and denied the requests for discovery and for a continuance. Whether to grant such motions rests within the sound discretion of the district court. *See United States v. Dougherty*, 895 F.2d 399, 405 (7th Cir.) (denial of continuance will not be reversed unless district court abused its discretion), *cert. denied,* — U.S. ——, 110 S.Ct. 3249, 111 L.Ed.2d 759 (1990); *United States v. Mitchell*, 778 F.2d 1271, 1276 (7th Cir.1985) (reversal warranted only if court abused its discretion in denying discovery). Moreover, to prevail, the defendant must show that "actual prejudice resulted from the denial." *United States v. Turk*, 870 F.2d 1304, 1307 (7th Cir.1989).

The district court listened to the tapes and determined that they were irrelevant to the case and thus were not discoverable. Accordingly, the court ruled that Mr. Beverly was not entitled to a continuance to examine the tapes. We have reviewed transcripts of the tapes[25] and agree with the district court. The tapes do not contain evidence relevant to either the charges against Mr. Beverly in this case or to his theory of defense. Nor were the tapes discoverable on the basis of Fed.R.Crim.P. 16(a), which requires the government to disclose only *"relevant* written or recorded statements made by the defendant." *Id.*

**24.** Mr. Beverly also claimed that the court abused its discretion in denying a continuance based on the government's failure to meet several deadlines set by the court. The government concedes that not all court orders were met on time, *but it objected to continuances because* the defense was not harmed by the delays. Indeed, the court denied the motion based on lack of prejudice to the defendants. That conclusion was well within the district court's discretion and is supported by the record. *See United*

*States v. Dougherty*, 895 F.2d 399, 405 (7th Cir.) (continuance properly denied where such denial did not prejudice defendants), *cert. denied,* — U.S. ——, 110 S.Ct. 3249, 111 L.Ed.2d 759 (1990).

**25.** The district court examined these transcripts, determined that they were accurate, and had them filed under seal as part of the record.

(emphasis supplied). Moreover, our review of the record reveals no prejudice to Mr. Beverly. He claims nevertheless that his decision of whether to testify was impaired by the prospect of cross-examination based on his unknown statements. We disagree; the district court's ruling clearly was based on the tapes' lack of relevance. Statements from them were not available for purposes of cross-examination for the same reason the government was not required to produce them. The district court acted within its discretion on this matter. We therefore affirm the denial of Mr. Beverly's motions.

### 2. Betty McNulty

#### a. *entrapment*

█ Ms. McNulty first claims that she was not predisposed to commit a drug crime and thus was entrapped by Johnny Davis into obtaining and selling cocaine. As we recently stated in *United States v. Rivera–Espinoza*, 905 F.2d 156, 158 (7th Cir.1990):

> [t]he principles surrounding the defense of entrapment are well-established. A defendant who wishes to assert the entrapment defense must produce not only evidence of the government's inducement, but also evidence of his own lack of predisposition. Once this has been accomplished, the burden shifts to the government to prove beyond a reasonable doubt that the defendant was in fact predisposed or that there was not government inducement.

*See also United States v. Franco*, 909 F.2d 1042, 1044–45 (7th Cir.1990); *United States v. Carrasco*, 887 F.2d 794, 814 (7th Cir. 1989); *United States v. Fusko*, 869 F.2d 1048, 1051 (7th Cir.1989). At trial, the government convinced the jury that Ms. McNulty was predisposed to sell cocaine. On appeal, she challenges only the evidence on this issue, which is characterized as the " 'principle element' " in the entrapment defense. *Mathews v. United States*, 485 U.S. 58, 63, 108 S.Ct. 883, 886, 99 L.Ed.2d 54 (1988) (quoting *United States v. Russell*, 411 U.S. 423, 433, 93 S.Ct. 1637, 1643, 36 L.Ed.2d 366 (1973)). This element focuses on "whether the defendant was an 'unwary innocent' or, instead, an 'unwary criminal' who readily availed himself of the opportunity to perpetrate the crime." *Id.* (quoting *Russell*, 411 U.S. at 436, 93 S.Ct. at 1645). In assessing whether a defendant was predisposed to commit a crime, we examine several relevant factors:

> (1) the character and reputation of the defendant, including any previous criminal record; (2) whether the suggestion of the criminal activity was originally made by the government; (3) whether the defendant was engaged in criminal activity for profit; (4) whether the defendant expressed reluctance to commit the offense which was overcome only by repeated government inducement or persuasion; and (5) the nature of the inducement or persuasion applied by the government.

*Rivera–Espinoza*, 905 F.2d at 157–58 (quoting *United States v. Lazcano*, 881 F.2d 402, 406 (7th Cir.1989)); *see United States v. Perez–Leon*, 757 F.2d 866, 871 (7th Cir.), *cert. denied*, 474 U.S. 831, 106 S.Ct. 99, 88 L.Ed.2d 80 (1985). None of these factors, considered alone, are determinative. *Franco*, 909 F.2d at 1044–45; *Perez–Leon*, 757 F.2d at 871. We shall affirm the jury's verdict if any rational trier of fact could have found the requisite predisposition beyond a reasonable doubt. *Rivera–Espinoza*, 905 F.2d at 158.

█ Examining the evidence adduced at trial in light of these factors, we conclude that a rational juror could have found that Ms. McNulty was predisposed to sell cocaine. The evidence of her character and reputation is inconclusive. She had no prior record, although she admitted to Davis that she previously had obtained drugs for a friend. *See Carrasco*, 887 F.2d at 815. She also illustrated her "sophistication and knowledge of the drug business by stating [to the buyer] that the price . . . was a good one," *Perez–Leon*, 757 F.2d at 872, and demonstrated that she was "not unfamiliar with 'the business' for which" she was convicted, *Rivera–Espinoza*, 905 F.2d at 158, by using terms of art and informing Davis that he would get more for his money if he purchased the cocaine in powder

form. With regard to the next factor, it is undisputed that the government, through Davis, approached Ms. McNulty with the request to purchase some cocaine. However, " 'mere solicitation by~ itself by a government agent is not sufficient to establish the entrapment defense.' " *Id.* (quoting *Perez–Leon,* 757 F.2d at 872). Third, it is unclear from the record whether Ms. McNulty sold cocaine to Davis for profit. In both transactions, Ms. McNulty was very careful to recount the money Davis paid her. The evidence does not reveal that "profit" was ever mentioned, although "we can assume that a person who operates in a chain of cocaine distribution does not do so at a financial loss." *Id.*

The fourth factor is the most important in the predisposition equation. *Id.* at 159; *United States v. Marren,* 890 F.2d 924, 930 (7th Cir.1989); *Carrasco,* 887 F.2d at 815; *Perez–Leon,* 757 F.2d at 871. In this case, it is clear that Ms. McNulty did not exhibit reluctance and was not cajoled into supplying Johnny Davis with cocaine. After he initially requested to purchase some cocaine and said he wanted a good price, Ms. McNulty did not turn him down. To the contrary, she directed him to leave his telephone number and indicated that she could give him a price of $900 for half an ounce of cocaine. This conversation took place in person at the Blacom office, prior to the telephone calls Ms. McNulty claims were used to entrap her. When she indicated several days later that she was having trouble obtaining the cocaine from her source, she did not abandon the project, but expressed her willingness to pursue the transaction. Moreover, she was very solicitous in advising Davis to purchase the cocaine in powder form for the best value and in demonstrating how to carry it to minimize its attraction as something of value.

Finally, the nature of the government's inducement was in dispute. The government contends that Ms. McNulty responded willingly and knowledgeably to Davis' purchase request; the defendant asserts that she obtained and sold the cocaine only after being persuaded by "flagrant coercive tactics." McNulty's Br. at 3. Balanced against the evidence described above, which is favorable to the government's position, is the single occasion on which Ms. McNulty expressed reluctance about the transactions. During the fourth contact with Davis (the second telephone call of August 11, 1986), Ms. McNulty commented that she was not sure she should set up the sale yet. However, the record makes clear that Ms. McNulty made this comment because she was angry with Davis for personal reasons unrelated to the narcotics transaction.[26] We note that "[t]his, like the other factors considered in this five-factor test, was a question of fact which was properly submitted to the jury. The jury, as was its prerogative, chose to believe the testimony presented by the government." *Rivera–Espinoza,* 905 F.2d at 159 (citation omitted); *see Perez–Leon,* 757 F.2d at 872. Based on our review of the record and in light of the five factors discussed above, we conclude that there was more than enough evidence to support the jury's conclusion that Ms. McNulty was predisposed to obtain and sell cocaine and, as such, was not entrapped.

■■■ Ms. McNulty also maintains that the district court abused its discretion in responding to the jury's request for further direction on the entrapment issue. At approximately 2:00 p.m., the jury inquired whether there was any guidance, other than the jury instructions, to help determine whether Betty McNulty had been entrapped. Ms. McNulty retendered her initial instruction on entrapment, which had been rejected in favor of the government's similar proffer, and asked that it be given as a supplemental instruction. Upon the government's objection,[27] Ms. McNulty abandoned her request for additional instruction and instead asked the court to

---

**26.** *See supra* p. 343.

**27.** The government argued that the jury would be confused by additional instruction because the instruction given on entrapment and Ms. McNulty's proffered supplemental instruction were phrased differently but carried the same meaning.

refer the jury to the entrapment instruction originally read; the court did so.

[17] Notwithstanding the fact that she waived any claim on this issue but one predicated on plain error by failing to object to the original entrapment instruction or to the court's decision to refer the jury to that instruction rather than give an additional charge,[28] we determine that her claim is without merit. As we said in *United States v. Cheek,* 882 F.2d 1263, 1268 (7th Cir.1989), *cert. granted on other grounds,* —— U.S. ——, 110 S.Ct. 1108, 107 L.Ed.2d 1016 (1990), reinstruction is merely *appropriate* "[o]nce it is clear that a jury has difficulties concerning the original instructions." We also made clear that "whether or not to give reinstruction at all is within the discretion of the trial court," as is the "character and extent of supplementary instructions." *Id.; see also United States v. Franco,* 874 F.2d 1136, 1143 (7th Cir.1989); *United States v. Mealy,* 851 F.2d 890, 901–02 (7th Cir.1988). In this case, the court acted well within its discretion in refusing to read an instruction it already had rejected and in instructing the jury to continue their deliberations in light of the instructions given. We find no reversible error in this decision. *See Mealy,* 851 F.2d at 902 (if original jury charge clearly and correctly states applicable law, district court may properly answer jury's question "by instructing the jury to reread the instructions").

b. *conspiracy conviction*

■ Ms. McNulty was convicted of violating 18 U.S.C. § 371, conspiracy to defraud the United States. The crime was charged as a dual-objective conspiracy; the first alleged goal was to impede the IRS in computing taxes (the tax object), and the second was to impede the DEA in ascertaining forfeitable assets (the drug object). On appeal, Ms. McNulty challenges the sufficiency of the evidence with respect to only her knowledge of the tax object of the conspiracy. She also claims that the jury's

general verdict is ambiguous and must be reversed.

As will be seen below, a general verdict in a dual-object conspiracy case is problematic under some circumstances. Such an instance is not presented here. Rather, Ms. McNulty's appeal is disposed of by the general rule that "when a jury returns a guilty verdict on an indictment charging several acts in the conjunctive, ... the verdict stands if the evidence is sufficient with respect to any one of the acts charged." *Turner v. United States,* 396 U.S. 398, 420, 90 S.Ct. 642, 654, 24 L.Ed.2d 610 (1970); *accord United States v. Bucey,* 876 F.2d 1297, 1312 (7th Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 565, 107 L.Ed.2d 560 (1989). Here, Ms. McNulty's conspiracy conviction will be affirmed because she does not contest that the jury could convict her under the DEA objective. *See United States v. Soteras,* 770 F.2d 641, 646 (7th Cir.1985) (citing *United States v. Alvarez,* 735 F.2d 461, 465–66 (11th Cir.1984) (conviction may be upheld under unchallenged objective where dual-objective conspiracy is charged and evidence is claimed to be insufficient as to only one objective)).

■ Moreover, Ms. McNulty's claim regarding the general verdict is merely an attack on the sufficiency of the evidence. However, the record amply supports her conviction under the IRS objective. To establish a violation of section 371, the government must show that a defendant " ' "agreed to interfere with or obstruct one of [the government's] lawful functions by deceit, craft or trickery, or at least by means that are dishonest." ' " *Bucey,* 876 F.2d at 1312 (citations omitted). Where the sufficiency of the evidence is challenged, "[w]e may overturn a verdict only when the record is devoid of any evidence, regardless of how it is weighed, from which a jury could find guilt beyond a reasonable doubt." *United States v. Durrive,* 902 F.2d 1221, 1225 (7th Cir.1990); *see also United States v. Valencia,* 907 F.2d 671, 676 (7th Cir.1990).

28. *See United States v. Valencia,* 907 F.2d 671, 680 (7th Cir. July 16, 1990) (court reviews instruction only for plain error where defendant failed to object at trial).

▇ The government in this case produced sufficient evidence for the jury reasonably to infer that Ms. McNulty was part of a conspiracy to impede the IRS: on her 1985 tax return, Ms. McNulty claimed Somons as a sole proprietorship. There is no evidence that she was involved with the lounge in any way, although the jury heard evidence that Somons was Mr. Beverly's business. Given the fact that Ms. McNulty had not filed tax returns in the immediately preceding years, the jury was entitled to conclude that she filed the 1985 return and claimed Somons as her own in an attempt to conceal from the IRS the true owner. Moreover, the jury properly could conclude that Ms. McNulty allowed Mr. Beverly to place goods (she was the titleholder to the Mercedes Benz Mr. Beverly purchased), to place property (she was the lessee on two leases negotiated by Mr. Beverly and the named grantee on the deed to at least one parcel of real estate), and to make expenditures (Mr. Beverly's American Express account was paid exclusively with checks from her checking account) in her name in an effort to defraud the IRS.[29]

### 3. George Brown

#### a. *guilty verdict*

▇ Mr. Brown claims first that the government failed to produce sufficient evidence to sustain either the conspiracy charge or the substantive possession counts because (1) Peter Suarez was an incredible and unreliable witness, (2) the only evidence against Mr. Brown was provided by Suarez and was uncorroborated, and (3) most of the evidence was circumstantial. It is well settled both that a reviewing court will not disturb a jury's credibility findings, *see, e.g., United States v. Edun,* 890 F.2d 983, 988–89 (7th Cir. 1989),[30] and that a conviction may rest solely on circumstantial evidence, *see, e.g., United States v. Durrive,* 902 F.2d 1221, 1225 (7th Cir.1990). This is true even when the evidence at trial is "totally uncorroborated and comes from an admitted liar, convicted felon, large scale drug-dealing, paid government informant," as the defendant claimed in *United States v. Molinaro,* 877 F.2d 1341, 1347 (7th Cir.1989). We responded in *Molinaro,* as we do today, that "[t]his argument is wasted on an appellate court; [the defendant] thoroughly attacked [the witness'] credibility at trial and the jury, which is the only entity entitled to make such credibility determinations, apparently decided to believe [the witness'] testimony despite his many character flaws." *Id.; see United States v. Mejia,* 909 F.2d 242, 245 (7th Cir.1990) (rejecting defendant's sufficiency claim; which was based on argument that government witness' testimony was inherently unreliable). Thus, even if uncorroborated and circumstantial, Suarez' testimony that Mr. Brown sold cocaine from the Mayfield house and assisted in the drug transactions between Mr. Beverly and Suarez was sufficient to support the jury verdicts.

Moreover, Mr. Brown's position ignores the fact that the evidence against him was not wholly uncorroborated. Suarez testified that he sold cocaine to Mr. Beverly and Mr. Brown in Chicago on ten separate occasions between April and November of 1986. The government introduced various records from airlines, hotels, and car rental agen-

---

**29.** Thus, Ms. McNulty's reliance on *Yates v. United States,* 354 U.S. 298, 311–12, 77 S.Ct. 1064, 1072–73, 1 L.Ed.2d 1356 (1957), *overruled on other grounds, Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978), and its progeny is misplaced. This is not a case where two objects of a conspiracy were charged and there is a legal insufficiency with respect to one of the objects, placing the legality of the conviction under a general verdict in question. *See id.* (statute of limitations had run on one of the charged objectives). As noted above, Ms. McNulty does not challenge the DEA object of the conspiracy and there was sufficient evidence

for the jury to convict her under the tax object. As such, the general verdict was permissible.

**30.** *But see United States v. Grandinetti,* 891 F.2d 1302, 1307 (7th Cir.1989) (jury determinations of testimonial truth upheld unless testimony is incredible as a matter of law), *cert. denied,* —— U.S. ——, 110 S.Ct. 1534, 108 L.Ed.2d 773 (1990); *United States v. Dunigan,* 884 F.2d 1010, 1013 (7th Cir.1989) (verdicts based solely on accomplice's uncorroborated testimony upheld unless testimony is incredible as a matter of law). However, "[m]ere inconsistencies in the witness' testimony do not render it legally incredible." *Dunigan,* 884 F.2d at 1013.

cies to document Suarez' presence in Chicago on seven of those ten instances.[31] The government also introduced drug paraphernalia, recovered from Mr. Brown's apartment, that was identified as equipment used by drug dealers rather than mere drug users.[32]

### b. *sentencing*

Mr. Brown asserts that the district court erred in finding that he was second in command of the drug enterprise. He claims that, because the court sustained his objection to Suarez' description of him as Mr. Beverly's "righthand man," Tr. at 739–40, the court concluded "that there was nothing in the record to indicated [sic] Wes Brown was a right hand man and that he held any possession [sic] of authority in the organization," Brown's Br. at 13. We cannot say that the district court abused its discretion in finding that Mr. Brown held a position of high authority in the drug conspiracy. The decision to sustain the objection during trial means only that it was improper to portray Mr. Brown as Mr. Beverly's "righthand man"; it clearly does not mean that the court made a factual determination that Mr. Brown did not play a key role in the enterprise. Moreover, Mr. Brown's claim ignores evidence, the bulk of which came after the objection, from which the court properly could determine that he was more than just the "errand boy" he claims to have been. Brown's Br. at 13. Suarez stated without objection that, during a meeting to discuss cocaine, Mr. Beverly introduced Mr. Brown as a "close associate, brother like." Tr. at 730. The court heard testimony that Mr. Brown took part in nearly every drug transaction between Mr. Beverly and Suarez. Mr. Brown handled the money used to purchase cocaine, retrieved large quantities of the drug following the transactions, and returned with the narcotics to the Mayfield house. There also was testimony that he sold packages of "white powder" to customers at the

Mayfield house for $50 and $100, then converted the powder to rock form for the customers to smoke. Tr. at 746. Based on this evidence, the court certainly did not abuse its discretion in concluding that Mr. Brown played more than a peripheral role in the organization and that he "ran at least one of the smoke houses." Sentencing Tr. at 49. Finally, the court's sentence was based in part on the fact that Mr. Brown had prior contacts with the law and "seem[ed] to have learned no lesson." *Id.* at 50. These were proper considerations and reveal that the district court exercised its discretion. Accordingly, the sentence is affirmed. *See United States v. Briscoe,* 896 F.2d 1476, 1519 (7th Cir.1990).

Mr. Brown argues in the alternative that, even if the basis of his sentence was proper, the district court imposed disparate sentences. This claim also lacks merit. As a general matter, a sentence will not be overturned on appeal absent an abuse of the district court's discretion. *United States v. Goot,* 894 F.2d 231, 237 (7th Cir.1990). "A mere showing of disparity in sentences among codefendants does not, without more, demonstrate any abuse of discretion." *United States v. Marren,* 890 F.2d 924, 937 (7th Cir.1989). " 'Only when a judge imposes disparate sentences on *similar* defendants without explanation does even an inference of impropriety arise.' " *Briscoe,* 896 F.2d at 1519 (quoting *United States v. Neyens,* 831 F.2d 156, 159 (7th Cir.1987)) (emphasis in *Neyens* ).

Here, it is clear that the district court did not abuse its discretion. The defendants were convicted of different crimes and thus were not "similar." *See id.* Moreover, the court explained why it imposed each sentence and why some sentences were harsher than others. Mr. Beverly was sentenced to thirty-five years because of his prior record and the fact that he was "the ring leader of this ... very profitable narcotics organization from 1979 through '87." Sen-

---

31. As noted above, Mr. Brown was acquitted of the charges stemming from the three occasions on which the government was unable to demonstrate that Suarez had travelled to the city.

32. We recently noted in *United States v. Valencia,* 907 F.2d 671, 678 (7th Cir.1990), that "[t]he intent to distribute drugs has been inferred from ... possession of drug-packaging paraphernalia."

tencing Tr. at 47. In Mr. Brown's case, the court considered his prior record and the fact that he had been part of the enterprise for at least eight years, that he ran at least one of the smoke houses, that he aided the transactions between Mr. Beverly and Suarez, and that guns were found in his apartment. *See supra* p. 349; *see also* Sentencing Tr. at 50 ("in light of the fact that you've had contact with the law before and you seem to have learned no lesson, it's appropriate that the Court sentence you ... to a period of 20 years"). Betty McNulty received a lighter sentence because she had no prior record and her role in the conspiracy was "much less than the involvement of Mr. Brown or Mr. Alex Beverly, who ran the organization." Sentencing Tr. at 50–51. Finally, Ms. Griffin, who also had a clean record, had "the least involvement" in the enterprise and thus received the lightest sentence. *Id.* at 52. These considerations demonstrate that the court "had a principled basis for sentencing [Mr. Brown] to a stiffer penalty." *Marren*, 890 F.2d at 937. The court contemplated each sentence imposed and thoroughly explained any disparity among the sentences. Thus, not even an inference of impropriety arises. *See Briscoe*, 896 F.2d at 1519. Accordingly, Mr. Brown's sentence is affirmed.

### 4. Diane Griffin

#### a. *sufficiency of evidence*

▇▇▇ Like Ms. McNulty, Ms. Griffin was found guilty on the dual-objective conspiracy charge. She claims first that the evidence was insufficient to support her conviction. As noted above, the verdict will be upheld unless there is no evidence from which the jury could find guilt beyond a reasonable doubt. *See United States v. Durrive*, 902 F.2d 1221, 1225 (7th Cir.1990). Because this case was tried to a jury, "we must on review defer to reasonable inferences drawn by the jury and the weight it gave to the evidence. Likewise, we leave

the credibility of witnesses solely to the jury's evaluation, absent extraordinary circumstances." *United States v. Hogan*, 886 F.2d 1497, 1502 (7th Cir.1989) (citation omitted). With regard to the conspiracy charged in this case, "[i]t is fundamental that a conviction for conspiracy under 18 U.S.C. § 371 cannot be sustained unless there is 'proof of an agreement to commit an offense against the United States.'" *Ingram v. United States*, 360 U.S. 672, 677–78, 79 S.Ct. 1314, 1318–19, 3 L.Ed.2d 1503 (1959) (quoting *Pereira v. United States*, 347 U.S. 1, 12, 74 S.Ct. 358, 364, 98 L.Ed. 435 (1954)).

Because the government concedes that there was no evidence to support a conviction under the DEA arm of the conspiracy, the verdict can be upheld only if there was sufficient evidence to establish that Ms. Griffin knowingly allowed Mr. Beverly to put assets in her name in order to impede the IRS in ascertaining Mr. Beverly's taxable income. We conclude that there was. The record supports that Ms. Griffin (1) allowed Mr. Beverly to put property he owned in her name, (2) filed a false tax return claiming Mr. Beverly's income as her own, and (3) used Mr. Beverly's money to purchase a car in her name. Moreover, a rational jury could have found that at least two of Ms. Griffin's actions are "reasonably explainable only in terms of motivation to evade taxation," *id.* 360 U.S. at 679, 79 S.Ct. at 1320. First, the jury could have found that Mr. Beverly actually owned Tit's [33] and that Ms. Griffin filed tax returns claiming it as her own in order to conceal his ownership. The jury also could have determined that Ms. Griffin underreported the income from Tit's as part of the scheme: she claimed that the income from Tit's, a cash lounge, was only $5,459 in 1985, yet Suarez testified that on one occasion alone Mr. Beverly took $2,000 from the cash register at Tit's to purchase cocaine.

---

**33.** The evidence revealed that the bar had been purchased in Ms. Griffin's name, but Mr. Beverly purchased the building that housed Tit's and paid for its complete renovation and furnishings. He also took several thousand dollars from the cash register on at least one occasion. Moreover, Ms. Griffin did not tell Johnny Davis that she owned the bar but responded that it was "[hers] to run." Tr. at 209.

Second, the manner in which the $35,000 Jaguar was purchased in 1985 is indicative of the unlawful motivation to impede the IRS: as noted above, an initial down payment of $500 in cash was made on the car on September 16. A $7,000 payment was made on September 23 by check, followed by cash payments on September 30 ($8,000), October 1 ($7,000), October 2 ($6,000), and October 3 ($7,186). Paid over a short period of time and largely in cash, the purchase was structured such that the reporting requirement regarding cash payments in excess of $10,000 was not triggered. *See* 26 U.S.C. § 6050I; *see also United States v. Bucey*, 876 F.2d 1297, 1306 n. 17 (7th Cir.), *cert. denied*, — U.S. —, 110 S.Ct. 565, 107 L.Ed.2d 560 (1989). A jury was entitled to find on this evidence that Ms. Griffin intended to impair the IRS in assessing Mr. Beverly's taxes.

Relying on *Ingram and United States v. Krasovich*, 819 F.2d 253 (9th Cir.1987), Ms. Griffin asserts that the government was required to prove more than the hiding of assets because her conduct may be explained by motives other than a desire to impede the IRS. For example, she may have been helping Mr. Beverly conceal his gambling, or she could have been merely a girlfriend willing to accept real estate, a business, a bank account, and a luxury car from her "sugar daddy." Griffin's Br. at 32. Her reliance on these cases is misplaced. In *Ingram*, where income from illegal gambling activity was concealed, there was no evidence that the defendants were aware of any tax liability. 360 U.S. at 677, 79 S.Ct. at 1318. Here, the jury could infer that Tit's actually belonged to Mr. Beverly and that Ms. Griffin was aware of his tax liability from the bar because she filed tax returns regarding that asset. Thus, unlike the evidence in *Ingram*, the evidence adduced in this trial was not remote. *See Hogan*, 886 F.2d at 1503. In *Krasovich*, the defendant hid the true ownership of a pickup truck by registering the truck in his own name, although he never filed a tax return claiming ownership of the vehicle or otherwise indicated that it was his. 819 F.2d at 254. Thus, "[n]othing in the circumstances of

the transaction suggest[ed] that [he] knew that the purpose of the concealment was to evade taxes." *Id.* at 256. Here, on the other hand, Ms. Griffin allowed assets to be purchased in her name and represented to the government in her tax return that she owned Tit's bar.

Moreover, to prove a conspiracy, not every reasonable hypothesis of innocence need be excluded; the total evidence must allow the jury to conclude that the defendant is guilty beyond a reasonable doubt. *See United States v. Khorrami*, 895 F.2d 1186, 1191 (7th Cir.1990); *United States v. Grier*, 866 F.2d 908, 923 (7th Cir.1989). In *United States v. Pace*, 898 F.2d 1218, 1236 (7th Cir.), *cert. denied*, — U.S. —, 110 S.Ct. 3286, 111 L.Ed.2d 795 (1990), the defendant maintained that the evidence failed to support the forfeiture of money found in his home because the circumstances indicated that the cash was related to his gambling activities rather than any narcotics transaction. Our holding there is equally applicable in this case. We stated that, "while the jury could have inferred that the money was related to gambling, not cocaine, the jury could have also inferred that the money was related to the cocaine transaction. The choice of which inference to draw was for the jury, and we will not disturb that choice." *Id.* Accordingly, we conclude that the record supports the jury's conclusion that Ms. Griffin conspired to impede the IRS in ascertaining Mr. Beverly's taxable income.

### b. *general verdict*

Our inquiry with regard to Ms. Griffin's conviction does not end with the determination that the evidence supports the jury's verdict. Ms. Griffin also claims that she is entitled to a new trial based on the verdict form. She maintains that, because the jury returned a general verdict, it is impossible to determine whether she was convicted for conspiracy to defraud the IRS—for which there is sufficient evidence—or for conspiracy to defraud the DEA—which the government failed to prove.

There have been a number of Supreme Court and appellate decisions on the problems that stem from general verdicts. The critical factor in many of these cases is whether the appellant's claim is based on an alleged legal insufficiency or an alleged factual insufficiency. As noted above, "[t]he general rule is that when a jury returns a guilty verdict on an indictment charging several acts in the conjunctive, ... the verdict stands if the evidence is sufficient with respect to any one of the acts charged." *Turner v. United States,* 396 U.S. 398, 420, 90 S.Ct. 642, 654, 24 L.Ed.2d 610 (1970). This rule does not hold true, however, when a general jury verdict renders it impossible to say whether a defendant was convicted on an unconstitutional or legally invalid ground. Thus, the conviction must "be set aside in cases where the verdict is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected." *Yates v. United States,* 354 U.S. 298, 312, 77 S.Ct. 1064, 1073, 1 L.Ed.2d 1356 (1957), *overruled on other grounds, Burks*

*v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978).[34]

Ms. Griffin relies on this language from *Yates.* However, the insupportable ground in that case was legal in nature rather than factual. As with Ms. Griffin, the defendant in *Yates* was charged with and convicted of a dual-objective conspiracy under 18 U.S.C. § 371. *Id.,* 354 U.S. at 300–01, 77 S.Ct. at 1067. However, the Supreme Court held that prosecution under one arm of the conspiracy was barred by the statute of limitations. The Court therefore concluded that, because the general verdict made it impossible to determine the basis of the jury's verdict, the judgment had to be set aside. *Id.* at 311–12, 77 S.Ct. at 1072–73. Thus, in *Yates* the theory supporting an object of the conspiracy was *legally* insufficient; here, the *evidence* fails to establish one object of the charged conspiracy.

Numerous courts have reversed general verdicts on the basis of *Yates* where one of the objects in a multi-object count is legally invalid.[35] Only a few courts, including this

---

**34.** The *Yates* decision relies on *Cramer v. United States,* 325 U.S. 1, 36 n. 45, 65 S.Ct. 918, 935 n. 45, 89 L.Ed. 1441 (1945) (general verdict must be set aside if any of the acts charged did not legally constitute treason); *Williams v. North Carolina,* 317 U.S. 287, 291–92, 63 S.Ct. 207, 209–10, 87 L.Ed. 279 (1942) (judgment based on general verdict cannot stand where one ground upon which it might rest is constitutionally invalid); *Stromberg v. California,* 283 U.S. 359, 367–70, 51 S.Ct. 532, 535–36, 75 L.Ed. 1117 (1931) (conviction reversed where one objective was unconstitutional and general verdict made it impossible to identify on which objective the judgement rested). For post-*Yates* decisions, *see, e.g., Bachellar v. Maryland,* 397 U.S. 564, 571, 90 S.Ct. 1312, 1316, 25 L.Ed.2d 570 (1970); *Leary v. United States,* 395 U.S. 6, 30–32, 89 S.Ct. 1532, 1545–46, 23 L.Ed.2d 57 (1969); *Street v. New York,* 394 U.S. 576, 585–88, 89 S.Ct. 1354, 1362–63, 22 L.Ed.2d 572 (1969).

**35.** *See, e.g., Feela v. Israel,* 727 F.2d 151, 155 (7th Cir.1984) (conviction overturned where court could not determine if jury based its decision on erroneously introduced evidence, for "where a verdict is general, and conviction under one of several alternate theories would be unconstitutional, the conviction must be set aside lest the verdict rest on an unconstitutional basis"); *Cramer v. Fahner,* 683 F.2d 1376, 1379 (7th Cir.) (conspiracy conviction reversed where verdict

could have been based illegally on overt acts which occurred after conspiracy ended; because court was "unable to tell whether the jury based its verdict on the valid or invalid counts, the general conspiracy conviction was unconstitutional"), *cert. denied,* 459 U.S. 1016, 103 S.Ct. 376, 74 L.Ed.2d 509 (1982); *United States v. Head,* 641 F.2d 174, 179 (4th Cir.1981) (conviction based on general verdict reversed where basis of multi-object conspiracy charge rested on acts occurring outside statute of limitations and district court refused to instruct jury that it had to find an overt act committed within the applicable period); *United States v. Kavazanjian,* 623 F.2d 730, 739–40 (1st Cir.1980) (general verdict multi-object conspiracy conviction under 18 U.S.C. § 371 reversed where one object failed to state a crime); *United States v. Carman,* 577 F.2d 556, 566–68 (9th Cir.1978) (conviction based on general verdict reversed where single conspiracy count charged commission of multiple substantive acts and one substantive count was reversed for failure to state a crime); *United States v. Baranski,* 484 F.2d 556, 560–61 (7th Cir.1973) (general verdict of guilty for multi-object conspiracy in violation of 18 U.S.C. § 371 reversed where one object found unconstitutional); *United States v. Driscoll,* 449 F.2d 894, 898 (1st Cir.1971) (general verdict on multi-object conspiracy charge overturned where one object was legally insufficient), *cert. denied,* 405 U.S. 920, 92 S.Ct. 948, 30 L.Ed.2d 790 (1972).

one, have examined specifically the issue of whether a conviction may be upheld where there is a failure of proof, rather than a legal insufficiency, with regard to one of the objects. In *United States v. Alvarez*, 860 F.2d 801, 815–18 (7th Cir.1988), the court determined, based on *Yates* and *United States v. Holzer*, 840 F.2d 1343 (7th Cir.1988),[36] that a CCE conviction could not stand because the evidence failed to show that the defendant had supervised two of the seven alleged subordinates and the jury did not indicate which five persons it found the defendant to have supervised. However, we subsequently granted rehearing and affirmed the conviction. *See United States v. Holguin*, 868 F.2d 201, 202–04 (7th Cir.), *cert. denied*, — U.S. —, 110 S.Ct. 97, 107 L.Ed.2d 60 (1989). On rehearing, the government asserted that "*Yates* and *Holzer* do not apply to sufficiency of evidence claims such as those presented here," but rather only to cases where " 'a count in an indictment specifies more than one ground upon which a conviction on that count may be based, and one of those specific grounds is unconstitutional or otherwise legally deficient.' " *Id.* at 202 (quoting Government's Br.). We concluded that "there is merit to this submission." *Id.* at 203. Based on several Ninth Circuit cases that held "that *Yates* does not apply to insufficiency of evidence claims,"[37] a result with which the Seventh Circuit had expressed general agreement,[38] the court determined that "these cases must control

the outcome here." *Id.* Accordingly, because there was evidence that the defendant had supervised at least five individuals, the court affirmed the CCE conviction. *Id.* at 204.

Only months after *Holguin* was decided, this court heard *United States v. Bucey*, 876 F.2d 1297 (7th Cir.), *cert. denied*, — U.S. —, 110 S.Ct. 565, 107 L.Ed.2d 560 (1989). In *Bucey*, the jury convicted the defendant, by general verdict, of conspiracy to defraud the government in violation of 18 U.S.C. § 371. The multi-object conspiracy count included, as here, both a tax and drug object. *Id.* at 1311 n. 26. In analyzing the legal claim that none of the acts comprising the conspiracy constituted a criminal offense, the court acknowledged the "general tenet of conspiracy law that when an indictment alleges a conspiracy with multifarious objectives, a conviction will be sustained so long as the evidence is sufficient to show that the defendants agreed to accomplish at least one of the alleged objectives." *Id.* at 1312. The court affirmed the conspiracy conviction and explicitly recognized the distinction between legally and factually impermissible grounds of conviction:

> Because none of the objectives upon which the jury may have relied involves a legally invalid or unconstitutional basis for conviction, the general verdict form does not require reversal of [the defendant's] conspiracy conviction.

---

**36.** In *Holzer*, mail fraud convictions were reversed in light of *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987). Because the jury could have found that the mail fraud charges constituted the necessary predicate offenses to a racketeering count, that conviction was vacated as well. 840 F.2d at 1352.

**37.** *See, e.g., United States v. Halbert*, 640 F.2d 1000, 1008 (9th Cir.1981); *United States v. Phillips*, 606 F.2d 884, 886 n. 1 (9th Cir.1979), *cert. denied*, 444 U.S. 1024, 100 S.Ct. 685, 62 L.Ed.2d 657 (1980); *United States v. Jessee*, 605 F.2d 430, 431 (9th Cir.1979); *United States v. Outpost Dev. Co.*, 552 F.2d 868, 869–70 (9th Cir.), *cert. denied*, 434 U.S. 965, 98 S.Ct. 503, 54 L.Ed.2d 450 (1977).

**38.** *See United States v. Soteras*, 770 F.2d 641, 646 (7th Cir.1985) (dual-object conspiracy con-

viction under section 371 affirmed where sufficient evidence supported one object; court did not have to examine whether evidence supported the second object); *see also United States v. Alexander*, 748 F.2d 185, 189 (4th Cir.1984) (court need not decide whether evidence supported second theory of count where sufficient evidence supported first theory and record indicated that jury relied on first theory), *cert. denied*, 472 U.S. 1027, 105 S.Ct. 3501, 87 L.Ed.2d 632 (1985); *United States v. Alvarez*, 735 F.2d 461, 465–66 (11th Cir.1984) (conviction will be affirmed for multi-objective conspiracy if the evidence supports at least one objective); *cf. United States v. Berardi*, 675 F.2d 894, 902 (7th Cir.1982) (where jury receives "one is enough" charge that any of the multiple acts alleged in the count may support conviction, general verdict may be upheld only if sufficient evidence supports each act alleged).

*Id.* at 1312 n. 27. Thus, the court found that it was unnecessary to examine whether the evidence supported all of the objectives and examined instead only whether the evidence supported the tax objectives. *Id.* at 1312 n. 28. Concluding that it did, the conviction was affirmed. *Id.* at 1313. *See United States v. Soteras,* 770 F.2d 641, 646 (7th Cir.1985).

This court most recently examined the issue in *United States v. Sababu,* 891 F.2d 1308 (7th Cir.1989), where the defendant claimed that his conviction may have been based on an illegal ground and that the general verdict should be vacated. The court rejected this claim because none of the grounds "were unconstitutional or legally deficient. Moreover, a conspiracy conviction will be [up]held as long as the evidence shows that the defendants agreed to commit at least one of the alleged objectives of the conspiracy." *Id.* at 1326 n. 6. Because the evidence showed that the defendants agreed to the alleged objectives, the court concluded that there was no basis for overturning the jury's general verdict. *Id.*

We note that the Second Circuit recently evaluated a claim similar to Ms. Griffin's

and failed to make a distinction between factual and legal insufficiency. In *United States v. Garcia,* 907 F.2d 380, 381 (2d Cir.1990), the defendants claimed that the evidence did not support their conviction under a dual-object conspiracy charge. The court concluded that a new trial was warranted because one of the two theories advanced by the government in support of the charge was not established by the evidence.[39] *Id.* We do not find this case persuasive. First, the Garcia panel did not recognize any Supreme Court precedent or address the factual/legal distinction issue, but relied solely on two of its prior decisions.[40] Second, one of those prior Second Circuit cases specifically identified the legal/factual distinction and found it outcome determinative. In *United States v. Ruggiero,* 726 F.2d 913 (2d Cir.), *cert. denied,* 469 U.S. 831, 105 S.Ct. 118, 83 L.Ed.2d 60 (1984), the Second Circuit reversed a RICO conviction where a *"legally insufficient* predicate act ... may have been necessary to the verdict." *Id.* at 921 (emphasis supplied). Moreover, the *Ruggiero* court distinguished *United States v. Natelli,* 527 F.2d 311, 325 (2d Cir.1975),

**39.** The Third Circuit may agree with this holding. *See United States v. Dansker,* 537 F.2d 40, 51 (3d Cir.1976) (general verdict for dual-objective conspiracy count reversed where evidence was insufficient to support conviction under one objective), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). This case may be distinguishable, however, on the ground that the trial court gave, with respect to the *objective* of the conspiracy, a "one is enough" instruction. *See United States v. Holguin,* 868 F.2d 201, 203 n. 5 (7th Cir.1989). *But see United States v. Velasquez,* 885 F.2d 1076, 1090–91 (3d Cir.1989) (conspiracy conviction reversed where no legal basis existed to support verdict because only named co-conspirator had been determined previously not to have joined conspiracy), *cert. denied,* —— U.S. ——, 110 S.Ct. 1321, 108 L.Ed.2d 497 (1990).

The only other court that has indicated in any way that it might agree with the Second Circuit on this issue is the First Circuit, although its position is unclear. The First Circuit has not addressed directly whether there is a distinction between factual and legal insufficiencies, but it has relied on *United States v. Natelli,* 527 F.2d 311, 325 (2d Cir.1975), *cert. denied,* 425 U.S. 934, 96 S.Ct. 1663, 48 L.Ed.2d 175 (1976), the one case supporting the view taken in *Garcia, see*

*infra* note 40. However, the insufficiencies in these cases were legal rather than factual. *See, e.g., United States v. Kavazanjian,* 623 F.2d 730, 740 (1st Cir.1980) (citing *Natelli,* court reversed general verdict multiobject conspiracy conviction under 18 U.S.C. § 371 where one object failed to state a crime); *United States v. Moynagh,* 566 F.2d 799, 804 (1st Cir.1977) (relying on *Natelli,* general verdict reversed where defendants' conduct could not constitute a crime), *cert. denied,* 435 U.S. 917, 98 S.Ct. 1475, 55 L.Ed.2d 510 (1978); *cf. United States v. Driscoll,* 449 F.2d 894, 898 (1st Cir.1971) (general verdict on multi-object conspiracy charge reversed because one object legally insufficient), *cert. denied,* 405 U.S. 920, 92 S.Ct. 948, 30 L.Ed.2d 790 (1972).

**40.** *See United States v. Ruggiero,* 726 F.2d 913, 921–22 (2d Cir.) (RICO conviction reversed where legally insufficient predicate act may have been necessary to verdict), *cert. denied,* 469 U.S. 831, 105 S.Ct. 118, 83 L.Ed.2d 60 (1984); *Natelli,* 527 F.2d at 325 (court relied on "the general principle" of *Yates* and found that general verdict was ambiguous and therefore reversible where one object in multi-object count was unsupported by the evidence; court did not identify that *Yates* related to legal insufficiency).

*cert. denied,* 425 U.S. 934, 96 S.Ct. 1663, 48 L.Ed.2d 175 (1976), the other case relied upon in *Garcia,* on the ground that *Natelli* addressed whether the evidence was sufficient to support one of several acts alleged within the charge rather than the legal sufficiency of the charge itself. *Id.* at 922. Finally, other precedent from within the Second Circuit does not support what appears to be the anomalous result in *Garcia.*[41]

Accordingly, we rely on precedent from this circuit that draws the distinction between legal and factually unsupported objects in multi-object conspiracy cases. Based on an application of the principles discussed in these decisions, we must affirm the jury's verdict. As discussed above, the evidence supports Ms. Griffin's conviction under the tax objective. Thus, there is no basis for overturning the jury's general verdict. *See Turner,* 396 U.S. at 420, 90 S.Ct. at 654; *Sababu,* 891 F.2d at 1326 n. 6; *Bucey,* 876 F.2d at 1312; *Holguin,* 868 F.2d at 202–04.

■ Finally, we do not understand why, once the government admitted it could not link Ms. Griffin to the DEA objective of the conspiracy count, the district court failed to grant a partial judgment of acquittal with respect to that count. Nevertheless, we do not believe that this failure resulted in substantial prejudice. In instructing the jury, the district court specifically referred to the conspiracy charged in count twenty as "the tax conspiracy." Tr. at 3624. Moreover, in acknowledging a misstatement made in closing argument, the Assistant United States Attorney specifically noted that the government did not contend that Ms. Griffin had conspired to defraud the DEA.

### Conclusion

For the foregoing reasons, we affirm the convictions and sentences of each defendant.

AFFIRMED.

**41.** *See United States v. Rastelli,* 870 F.2d 822, 830–31 (2d Cir.) (conviction upheld where one object was *legally insufficient,* but instructions made it clear that jury also found second object, which was legally and factually sufficient; had it not been clear, reversal would have been required under *Ruggiero* ), *cert. denied,* —— U.S. ——, 110 S.Ct. 515, 107 L.Ed.2d 516 (1989); *United States v. Southland Corp.,* 760 F.2d 1366, 1378 (2d Cir.) (dual-object conspiracy conviction upheld where evidence was sufficient under one object but may have been insufficient under second object), *cert. denied,* 474 U.S. 825, 106 S.Ct. 82, 88 L.Ed.2d 67 (1985); *United States v. Papadakis,* 510 F.2d 287, 297–98 (2d Cir.) (multi-object conspiracy conviction upheld where one object was not supported by evidence but other object was), *cert. denied,* 421 U.S. 950, 95 S.Ct. 1682, 44 L.Ed.2d 104 (1975).